[No. 20325. *En Banc.* November 24, 1926.]

THE STATE OF WASHINGTON *on the Relation of The Bookstore, Plaintiff,* v. W. G. POTTS, *as Treasurer, Respondent.*[1]

[1] PUBLIC LANDS (33-1)—GRANTS IN AID OF PARTICULAR IMPROVE-MENTS—APPLICATION OF PROCEEDS. There is no distinction be-tween the grant to the state of lands by the Enabling Act, § 12, for "erecting public buildings," and the grant by § 17, "for public buildings;" and the intent was to provide the state with public buildings constructed and equipped for use without resort to general taxation; hence the legislature had the right, by chapter 27, Laws of 1925, to appropriate $600,000 out of the state capital land grant, for furniture and furnishings of the legislative build-ing then under construction, since the same has an immediate and direct bearing upon the purposes for which the land had been set aside, and without which the buildings could not serve their purpose (TOLMAN, C. J., MACKINTOSH, BRIDGES, and HOLCOMB, JJ., dissenting).

[2] STATES (12)—AUTHORITY OF OFFICERS—STATE CAPITOL COMMITTEE. The state capitol committee, and not the director of business control, has the authority to expend the appropriation (by Laws of 1925, ch. 27) of $600,000 for furniture and furnishings of the legislative building; in view of Rem. Comp. Stat., § 7920, author-izing its predecessor (the state capitol commission) to erect and complete the building, the two laws relating to the same subject and being *in pari materia.*

[1] Reported in 250 Pac. 1090.

Application filed in the supreme court October 22, 1926, for a writ of mandamus to compel the state treasurer to pay a warrant drawn upon the capitol building construction fund.   Granted.

*Frank C. Owings,* for relator.

*The Attorney General* and *R. G. Sharpe, Assistant,* for respondent.

*Roberts & Skeel, amici curiae.*

MAIN, J.—This is an original application in this court for a writ of mandamus to compel the state treasurer to pay a warrant drawn upon the capitol building construction fund for the sum of seventy-two dollars and fifty cents, the purchase price of an office desk to be used as a part of the furnishings of the administrative and legislative building, now nearing completion at the state capital.   While the amount involved is small, the case really presents the larger question of whether the six hundred thousand dollars, appropriated by the legislature out of the capitol building construction fund for furniture and furnishings of the administrative and legislative building, can be paid out of that fund, or whether the furniture and furnishings must be paid out of the general fund which is derived from taxation.

By ch. 27 of the Laws of 1925, p. 61, the state capitol committee was authorized to issue bonds to the extent of four million dollars against the state capitol land grant and to sell the same.   It is out of the funds derived from the sale of these bonds that the legislature appropriated six hundred thousand dollars for furniture and furnishings for the administrative and legislative building.

The act of Congress, generally known as the Enabling Act, approved February 22, 1889, 25 Stat. at

L. 676, under which Washington territory became the state of Washington, made donations of the public land owned by the Federal government to the state for various purposes, one of which was for public buildings at the state capital. Under that act, to the land thus donated the state became the absolute owner of the title, which it holds in trust for the purposes therein specified. *State ex rel. Capitol Commission v. Clausen,* 134 Wash. 196, 235 Pac. 364.

The two sections of the Enabling Act which cover the matter of lands set aside for public buildings at the state capital are §§ 12 and 17. Section 12 provides:

"That upon the admission of each of said states into the Union, in accordance with the provisions of this act, fifty sections of the unappropriated public lands within said states, to be selected and located in legal subdivisions, as provided in section ten of this act, shall be and are hereby granted to said states for the purpose of erecting public buildings at the capital of said states for legislative, executive, and judicial purposes."

Section 17 provides that, in lieu of the grant of lands which had previously been made to other states for certain purposes there was granted,

"To the state of Washington: For the establishment and maintenance of a scientific school, one hundred thousand acres; for state normal schools, one hundred thousand acres; for public buildings at the state capital, in addition to the grant hereinbefore made for that purpose, one hundred thousand acres; for state charitable, educational, penal, and reformatory institutions, two hundred thousand acres.

"That the states provided for in this act shall not be entitled to any further or other grants of land for any purpose than as expressly provided in this act. And the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legis-

latures of the respective states may severally pro-
vide.''

[1] Under § 12, there was granted to this state
fifty sections, or 32,000 acres of land, for the purpose
of ''erecting public buildings'' at the state capital.
By § 17, there was granted 100,000 acres ''for public
buildings'' at the state capital. There has been much
discussion as to the meaning and limitations of the
word ''erect'' as used in § 12, but it seems to us that
the Congress did not intend a different meaning when
it used the words ''erect public buildings'' from that
when it said in § 17 ''for public buildings.'' Using
the words ''public buildings,'' and omitting the word
''erect'' in § 17, Congress provided that the 100,000
acres therein granted should be in addition to that be-
fore granted. ''For that purpose'' indicates that con-
gress had construed the words of § 12 to mean the same
as those of § 17, to-wit, public buildings. ''That pur-
pose,'' found in § 17, apparently referred to the words
''public buildings'' as used in that section and not
to ''erect public buildings'' as used in § 12. Again, in
§ 17 it is provided that the lands therein granted shall
be used exclusively for the purposes therein men-
tioned, that is, public buildings, and shall be disposed
of in such manner as the legislature of the state may
provide.

To arrive at the intent of Congress as it is expressed
in the Enabling Act, the conditions then present should
be called to mind. At that time, the Federal govern-
ment owned vast quantities of land in the territory
which was thinly settled. The resources thereof had
not been developed; industries had not been estab-
lished; transportation was limited and property values
were low. It was undoubtedly the purpose of Con-
gress, by making the grant, to give to the new state,

that should come in under the Enabling Act, land for public buildings at the state capital sufficient to enable such buildings to be constructed and equipped as an institution without resort to general taxation for any part of that expense. If resort should be made to general taxation for the purpose of raising the $600,000 necessary for the furniture and furnishings of the administrative and legislative building, a thing would be done which Congress sought to avoid. There is no provision in the act relative to acquiring land upon which the buildings could be erected, but manifestly this would be a necessary incident. The buildings and the land alone, without furniture and furnishings, would be useless for the purpose intended. The furniture and furnishings of the administrative and legislative building have an immediate and direct bearing upon the purpose for which the lands were granted.

In *United States v. Ervien*, 246 Fed. 277, the Federal circuit court of appeals for the eighth circuit construed an enabling act that applied to New Mexico. There, as here, public land had been granted by Congress to the state for various purposes, which the act provided should be held in trust. During the year 1915, the legislature of that state passed an act which authorized a portion of the money derived from these lands to be used for making known the resources and advantages of the state generally, and particularly to home-seekers and investors. The aggregate of the lands granted and confirmed in trust comprised about one twenty-sixth of the area of the state. The question there was, whether the object for which the money was to be used had such an immediate and direct bearing upon the purposes for which the lands were granted that the expenditure could be said to be authorized.

It was there held, that the object for which the money was to be used was too remote and indirectly consequential to authorize the use of trust funds. It was there said:

"The proposed campaign of publicity is for the general advancement of the state. It has no immediate or direct bearing upon the trust lands or purposes except as they are within and pertain to the state at large. For aught that appears, the lands may or may not be offered for sale at the time. The advantage accruing is too indirectly consequential to authorize the use of the trust funds."

The reasoning of that case leads directly to the conclusion that if the object for which the money was to be expended had an immediate and direct bearing upon the purposes for which the land had been set aside, it would have been a proper expenditure. The reason the court gives, for not sustaining the act of the legislature authorizing the use, was that the purpose for which the money was to be expended had no "immediate or direct bearing upon the trust lands or purposes," and that the advantage accruing was too "indirectly consequential" to authorize the use of trust funds.

It seems to us, that it cannot be successfully argued that an expenditure for furniture and furnishings for a new building at the state capital has no immediate or direct bearing upon the purpose for which the capitol lands were granted. The expenditure having a direct and immediate bearing, it is not a violation of the trust to use the fund derived from the bonding of the state capitol lands for such purposes.

From the judgment of the circuit court of appeals in the New Mexico case, an appeal was taken to the United States supreme court. *Ervien v. United States,* 251 U. S. 41 (40 S. Ct. 75). That court briefly disposed

of the matter, and, in effect, adopted the views of the circuit court of appeals. In the course of the opinion, it was said that the case "is not in broad range and does not demand much discussion." The opinion concludes:

"We need not extend the argument or multiply considerations. The careful opinion of the circuit court of appeals has made it unnecessary. We approve, therefore, its conclusion and affirm its decree."

One of the conclusions of the circuit court of appeals was that, if the proposed expenditure had no immediate and direct bearing upon the purpose for which the lands had been granted, then it could not be sustained. The corollary of this, as already stated, is that if the proposed expenditure does have a direct and immediate bearing upon the purpose for which the grant was made then it should be sustained.

The respondent cites the case of *Harrington v. Hopkins*, 288 Mo. 1, 231 S. W. 263, being an opinion by the supreme court of Missouri, as directly in point sustaining his contention. That case, however, differs from this. There the constitution placed a limit upon the amount of taxes that could be assessed for school purposes, except for the erection of buildings. The school district proposed to exceed the limit for repairing and furnishing a school building, and it was held, in a brief opinion with little discussion, that the tax limit as fixed by the constitution could not be exceeded for the purposes proposed. There the constitution had fixed the limit of taxation, and it was proposed to exceed this, not for the purpose of furnishing a new building, but for the repairing and furnishing of a building already in use.

That case presents a different question from what is presented, when the court is called upon to construe an act of congress which was granting to new states

a large quantity of land for specified purposes. The rule as to construing constitutional limitation as to taxation should not be applied with the same strictness to the terms of the Enabling Act, when the purpose of that act and the conditions existing when it was enacted are taken into consideration. The Enabling Act should be given a liberal, and not a narrow and restricted, construction for the purpose of carrying out its purpose and intent. However, if the Missouri case is assumed to be in point it is offset by the case of *Port Huron & Northwestern Railway Co. v. Richards,* 90 Mich. 577, 51 N. W. 680. There the defendant had signed a note to a railway company, by which he had agreed to pay a certain sum of money when the company had completed the construction of the railway to a certain point and ''erected a regular station for passengers and freight'' at a specified place. The circuit court directed a verdict for the defendant, and this was sustained by the supreme court. It is there said:

''The agreement contemplated that facilities should be furnished, not only for the accommodation of passengers, but for the reception and shipment of freight. This involved more than a mere place of shelter. 'And have erected a regular station' means more than the erection of a station-house. The word 'erect' may mean 'to build,' or it may mean 'to set up' or 'found' or 'establish' or 'institute,' according to the context. In the connection here used, it means 'to set up,' 'to establish.' ''

The respondent cites a large number of lien cases, where it has been held that a materialman has no lien for furnishings or furniture that may go into a building. This is largely by virtue of the provisions of the statutes upon which those cases arose. The statute of this state (Rem. Comp. Stat., § 1129 [P. C. § 9705]) pro-

vides that a lien shall exist in favor of one "furnishing material to be used in the construction" of a building. Under such a statute, it would be clear that furniture and furnishings were not material used in the construction. We think that the lien cases have no direct bearing and are not authority for the position taken by the respondent that the furniture and furnishings of the administrative and legislative building cannot be paid out of the funds derived from the sale of bonds upon the state capitol lands.

It follows that the relator is entitled to the writ which it seeks.

[2] There is another question of minor importance, and that is, whether expenditures for the furniture and furnishings of the administrative and legislative building are to be made by the director of business control or by the state capitol committee. The powers and duties of the director of business control are defined in Rem. Comp. Stat., §§ 10790 and 10795, [P. C. § 4-32 and § 4-37], which are two of the sections of the administrative code passed in 1921. Prior to the enactment of that code, there had been in existence for many years a state capitol commission. The powers and duties of that commission will be found in Rem. Comp. Stat., ch. 19. Section 7920 [P. C. § 6297-1] of that chapter, among other things, provides that the state capitol commission is authorized to provide for the erection and completion of public buildings at the capital for legislative, executive and judical purposes. In 1901 (Rem. Comp. Stat., § 10766 [P. C. § 4-8]), the legislature created the state capitol committee and provided that that committee should have the same powers and duties as were then vested in the state capitol commission. Nowhere in the administrative code do we find that the powers and duties of the state

capitol commission, or its successor the state capitol committee, have been conferred upon the director of business control. At the regular session of the legislature in 1925 (ch. 27, Laws 1925), as above stated, the state capitol committee were authorized to issue bonds upon state capitol lands to the extent of $4,-000,000. Sec. 5 of that act provided that there should be appropriated out of the capitol building construction fund the sum of $4,000,000, "to be expended by the state capitol committee in the completion of the construction of the administration and legislative building . . ." At the special session of the legislature in 1925 (ch. 95, Laws 1925, the general appropriation act), we find this:

"For capitol buildings and grounds:
From the Capitol Building Construction Fund: For Type 'A' painting,
fire alarms, telephone and telegraph connections, changing office partitions, lightning rods, real estate authorized by law and the payment of bond interest .....................$191,423.00
For electric lighting fixtures......... 200,000.00
For furniture and furnishings ....... 600,000.00"

It seems to us, that the appropriations here provided for must be read in connection with § 5 of ch. 27, Laws 1925, because, in that act, the legislature distinctly appropriated the sum of $4,000,000, to be expended by the state capitol commission in the completion of the construction of the administrative and legislative building. There is nothing in the appropriation act that would indicate an intention on the part of the legislature to take from the capitol committee the power to expend the money appropriated from the capitol building construction fund and confer the same upon the director of business control. The two acts should be read together, or, in other words,

are *in pari materia.* They relate to the same thing and have the same general purpose.

Let the writ issue as prayed for.

MITCHELL, FULLERTON, PARKER, and ASKREN, JJ., concur.

MACKINTOSH, J. (dissenting)—This action calls for an interpretation of two sections of the Enabling Act, the first one being § 12, where the language is clear and unambiguous, and admittedly not subject to interpretation, and provides that the grant by the Federal government shall be used "for the purpose of erecting public buildings;" and all agree this means the grant is to be used in the construction of such buildings, and not to be used for their furnishing, equipment, operation or maintenance. In § 17, an additional grant is made "for public buildings," and it is the contention that this language is ambiguous and uncertain, and therefore subject to interpretation, although the quoted language is immediately followed by the statement that the grant there made, in § 17, is one "in addition to the grant hereinbefore made for that purpose," clearly indicating the legislative intent to make the grants in §§ 12 and 17 for the same purpose; and it would, therefore, seem to follow that, conceding that the language "for public buildings" in § 17 is uncertain, Congress having declared that both purposes are the same, that language should be interpreted to mean the same as the certain, unambiguous and unequivocal language in § 12. For it has always been the rule that where two things have been declared to be the same, one of them certain and the other uncertain, the uncertain one shall be interpreted to mean the same as the certain. The contrary rule of interpretation, which has been adopted in the majority opinion, would, therefore, seem to be incorrect, and is certainly illogi-

cal, for, where the Congress has said that two grants are for the same purpose, the court has now said that the uniform purpose was the uncertain and ambiguous one in the latter section, and not the certain and clear one in the first section. There is another general rule of interpretation, of universal application, to the effect that specific and restricted language will have precedence over general and indefinite language, and where, as here, there is a specific and restricted grant in § 12, and a general and indefinite grant in § 17, and the two are to be interpreted together, the restricted grant must be the controlling one.

So far, I have assumed that the phrase in § 17, "for public buildings," is ambiguous and uncertain and therefore subject to interpretation. I am, however, of the opinion that such an assumption is unwarranted, for, where the words are used "for buildings," to me it clearly means, and the manifest intention is, that the money was to be used for buildings, and it has never occurred to me that, where money is given for a building, it was intended that that money might be used for land surrounding it or furniture in it. To extend the word "building" to include these things would be to give the word an unnatural and forced construction, for, ordinarily, when the word "building" is used, there is not presented to the one hearing it the idea of real estate and furniture. The definition of "building," adopted in the majority opinion, is one that cannot be adhered to subsequently. A case may easily arise where someone has contracted to sell a building, and thereafter the purchaser claim to have been defrauded because he did not receive title to real estate and to the furniture that happened to be in the building at the time the sale was made. In such a case, of course, the court would never acquiesce in such a contention.

More than this, to give to the word "building" the meaning adopted by the majority leads to an absurd result. The argument made in favor of including furnishing is that the Congress must have intended to give to the state a building ready and fitted to be occupied. If that is true, the grant is more extensive than one for building and furniture, and must include those things which make the furnished building available for use. Such a building must be heated and lighted, provided with janitor service, elevator service, repaired, renovated and kept in fit and proper condition for the purpose for which it was constructed. If the word "building" in § 17 does not mean building, but means usable building, then by the same token it means properly equipped and maintained, and the grant must have been for the erection of buildings, furnishing of buildings, maintenance and operation of buildings. But, as I understand the opinion, the court is arbitrarily including certain things within the term building, and excluding others. It is including ground and furniture, but excluding all those things which make the ground, building and furniture available for use. I can see no reason to support such a construction, which seems to be milking a he-goat into a sieve. Where the Congress made a grant for a definite and specific purpose, and another for a purpose which to some minds is not definite and specific, with a proviso that both purposes are the same, instead of making confused that which was clear, the court should make clear that which it thinks confused, and adhere to the clearly defined purpose.

For these reasons, I am forced to acquiesce in the interpretation of these two sections taken by the state treasurer and his counsel, the attorney general of the state. I therefore dissent.

BRIDGES, J. (dissenting)—I cannot bring myself to the view expressed in the majority opinion, much as I have desired and tried so to do. Nor do I agree with quite all that is said in the dissenting opinion of Judge Mackintosh, although I am in accord with most that is there written. Such being my situation, it seems proper for me to briefly express my own views.

I have not been much helped or persuaded by the arguments to the effect that the Congress desired to give assistance to the state, because it was new and would need financial assistance in connection with its capitol buildings. To me, it is just as reasonable to conclude that the Congress intended to give the state money with which to construct capitol buildings and let it furnish them at its own expense, as that it wished to give not only the buildings, but also the furniture for them. We should start out with the knowledge that the national government wished to aid the state, and then determine the extent of that aid by giving the words of the .grant their natural meaning.

It was considered by all the attorneys presenting the case to us, and I believe it will be conceded by those signing the majority opinion, that the purpose to be served by the grant of the fifty sections of land, as provided in § 12 of the Enabling Act, was the same purpose that was to be served by the grant of the additional 100,000 acres, provided for in § 17; that is, that the grant of the one tract was not for one purpose and the grant of the other for another, or different purpose. The state legislature has always considered the two grants as one and for identically the same purpose. The very money now in dispute was raised by one mortgage on all the lands in question. Such being the case, the words "for the purpose of erecting public buildings . . .," found in §12, either mean the same as the words "for public buildings . . .,"

found in § 17, or the last quoted words mean the same as the first quoted words.

To me, the words "for public buildings" naturally mean for the construction or erection of public buildings, and not for the construction and use of public buildings. However, I concede that it might not be stretching the English language too far to hold that the words "for public buildings" might embrace the idea not only of erecting but also of furnishing them. But, to my mind, the words, "for the purpose of erecting public buildings," are so clear as to their meaning as to make construction of them not only unnecessary, but wholly improper. Since, then, both grants were for the same identical purpose, the majority is forced to hold that the words "erecting public buildings" include furnishing them. In other words, the majority opinion brings that which is certain to the level of that which is uncertain, instead of bringing that which is uncertain to the level of that which is certain. To construe the words, "for public buildings," to mean "for the erecting of public buildings" gives effect to all the words of the grant, but to construe the words, "erecting public buildings," to mean the same as "for public buildings," and the latter as including furniture for the buildings, is to eliminate the important and certain word "erect." Reading the two grants together, I cannot get away from the conviction that the congress had in mind to furnish the state means whereby it might erect its capitol buildings, and for no other purpose. If it had intended to make a gift for not only constructing the buildings, but also for furnishing them, it could easily have used words which would have clearly indicated its desire.

Nor does this construction of the grant work any unfortunate result. Everybody knows that the government grant will be exhausted before all the capitol

buildings have been constructed, even though the money be used for construction purposes only. If we now buy furniture with a part of the money, we must later raise funds by taxation to construct the remainder of the capitol buildings. Indeed, there is not much in this case except from which of its two pockets the state will take the money necessary to buy furniture for the capitol buildings.

For the foregoing reasons, I feel impelled to dissent.

HOLCOMB, J. (dissenting)—I agree with the dissenting opinion of Judge Bridges, except that I agree with the prevailing opinion that whatever funds are expended are to be expended by the state capitol committee.

To what Judge Bridges has well said, I wish to add that I consider the capitol grant funds available, not only for erection of capitol buildings but for real estate necessary therefor.

I wish also to say that the capitol land grant is a grant for a specific purpose, a trust which we have said is "a sacred trust." It is not for the trustee of a sacred trust to stretch the terms of the trust granted so as to claim power never granted by specific terms.

The state courts should be as strict in requiring exact performance of the trust according to its plain import as the courts of the United States should be, and, as I firmly believe, would be. I am convinced the courts of the United States would never permit this diversion.

TOLMAN, C. J. (dissenting)—I adopt as my reasons for dissent all of the reasons given by BRIDGES and HOLCOMB, JJ.