[No. 20697.  *En Banc.*  June 21, 1927.]

THE STATE OF WASHINGTON, *on the Relation of Seattle
West-Made Desk Company, Plaintiff,* v.
ROLAND H. HARTLEY *et al.,
Defendants.*[1]

[1] STATES (12)—AUTHORITY OF OFFICERS—STATE CAPITOL COMMIT-
TEE.  The action of the majority of the state capitol committee,
in approving vouchers and ordering warrants issued in pay-
ment of contracts entered into by the committee, is controlling,
and makes such approval and issuance ministerial acts.

[2] SAME (12)—STATE CAPITOL COMMITTEE—STATUS OF GOVERNOR AS
MEMBER.  The abolishment of the state capitol commission by
the adoption by the administrative code also abolished the office
of chairman of the state capitol commission, and all statutory
ministerial powers of such chairman; hence the governor's sig-
nature is no longer necessary to secure the issuance of warrants
authorized by a majority of the state capitol committee.

[3] MANDAMUS (30)—SUBJECTS AND PURPOSES OF RELIEF—STATE OF-
FICERS—GOVERNOR.  Const., Art. 4, § 4, giving the supreme court
original jurisdiction in mandamus as to "all state officers,"
subjects the governor to the mandate of the court.

[4] SAME (85)—RETURN OR ANSWER.  In mandamus proceedings to
secure the approval of vouchers and the issuance of warrants
on contracts entered into by the state capitol committee, the

[1]Reported in 257 Pac. 402.

answer of a majority of the committee is binding on a minority member of the committee, who cannot interpose a different defense.

[5] STATES (12)—AUTHORITY OF OFFICERS—STATE CAPITOL COMMITTEE. The state capitol committee, and not the director of business control, has the authority to expend the appropriation (by Laws of 1925, ch. 27) of $600,000 for furniture and furnishings of the legislative building; in view of Rem. Comp. Stat., § 7920, authorizing its predecessor (the state capitol commission) to erect and complete the building, the two laws relating to the same subject and being *in pari materia*.

[6] STATES (13)—OFFICERS—STATE AUDITOR—AUTHORITY AND POWERS. Const., Art. 3, § 20, making it the duty of the state auditor to audit public accounts, does not preclude, by imposing inconsistent duties, his *ex officio* membership on the state capitol committee, having in its power the expenditure of large sums of money in the construction of the capitol buildings.

Application filed in the supreme court May 20, 1927, for a writ of mandamus to compel the state capitol committee to issue vouchers against the capitol building construction fund. Granted.

*Bogle, Bogle & Gates,* for relator.

*The Attorney General, L. B. Donley, Assistant, Coleman & Fogarty,* and *E. H. Guie,* for respondents.

*Frank C. Owings, amicus curiae.*

PARKER, J.—The relator desk company, by this original mandamus proceeding in this court, seeks a writ of mandate against the state capitol committee to compel the certifying and issuing of vouchers in part payment of furniture, under a contract therefor entered into by the relator and the state, acting through the capitol committee, to the end that the state auditor shall be authorized to draw warrants in favor of relator against funds appropriated by the legislature in part payment of the furniture.

The members of the state capitol committee, as at present constituted under the state administrative

code, ch. 7, Laws of 1921, p. 12; Rem. Comp. Stat., § 10759, are: Governor Hartley, state auditor Clausen and state commissioner of public lands Savidge.

By the allegations contained in the affidavit of the vice president of relator desk company, constituting its petition, and by admissions and allegations contained in the answer and return thereto made by auditor Clausen and commissioner Savidge on behalf of the committee, they being represented by the *Attorney General,* the controlling facts, as we view this controversy, appear and may be summarized as follows: On October 6, 1926, the state, acting through the capitol committee, auditor Clausen and commissioner Savidge as members of the committee concurring, the governor evidently not concurring, entered into a contract with relator desk company, by which it was to furnish and install for the state certain office furniture as a portion of the permanent equipment of the new executive and legislative building constituting the main building of our group of state capitol buildings. The furniture so contracted for was to be made, furnished and installed in compliance with drawings and specifications prepared therefor by the architects of the building. The contract contains, among other provisions, the following:

"Partial payments shall be made during the progress of the work as follows:

"At any time after December 15, 1926, during the execution of this contract, the contractor may submit a statement based on unit prices of the value of all work and of all material actually installed by him in the said building up to that time, which statement shall be subject to the approval of the architects, and on each such statement as approved by the architects, accompanied by proper vouchers, the state will pay to said contractor, eighty per cent of such approved statement, less all previous payments; the remaining twenty per cent thereof to be retained by the state

until the final completion and acceptance of said work by the state.''

On April 1 and 27 and May 17, 1927, the relator desk company, having furnished and installed in the building a large quantity of the furniture so contracted for, submitted to the committee statements of the quantities of furniture so furnished and installed prior to those respective dates, on which no payments have been made, and requested the committee to certify and issue vouchers for payments upon the furniture so installed equalling eighty per cent of the unit contract prices therefor, to the end that the auditor be authorized to accordingly issue warrants against the funds appropriated by the legislature for such furniture. These statements were each duly approved by the architects, and it is admitted by committeemen Clausen and Savidge in their answer that the contract has in all respects been complied with by relator desk company, in so far as the furnishing and installing of the furniture in question are concerned, and that relator desk company is entitled to vouchers authorizing payments therefor to the extent of eighty per cent of the unit contract prices therefor. The governor has refused to sign such vouchers, as chairman of the committee, though admittedly authorized to do so in so far as the committee has power to so authorize him. These facts, we think, clearly appear by the allegations in the petition of relator desk company and the admissions in the answer of committeemen Clausen and Savidge on behalf of the committee. They set up in their answer as an affirmative defense the following:

''That defendant Savidge has signed as secretary of the state capitol committee all the vouchers referred to . . . .

''That the defendant Clausen has been advised by the *Attorney General* of the state of Washington that

his signature to the vouchers above referred to in said affidavit was unnecessary, and would be a vain and useless thing, and that, he had no legal power or authority so to do, but that if the court should be of a contrary opinion, he is ready, able and willing to sign and approve said vouchers.''

The whole of the prayer of relator desk company is: ''That a writ of mandate issue requiring the signing and issuance of said vouchers.'' This prayer, in view of the several contentions made, manifestly means that the governor be required, as chairman of the committee, to sign the vouchers, or, in the alternative, that the committee cause the vouchers to be signed by a majority of its members, as a sufficient and lawful signing and issuance thereof.

The governor, as a member of the capitol committee, being represented by private counsel, responds separately to the petition of the relator desk company. He challenges, by demurrer, the jurisdiction of this court over him in the premises. He also, by answer, denies, in general terms, the legality of the contract. He also, in the form of an affirmative defense, alleges unfair practices, indulged in by the capitol committee and the architects, in connection with the invitations for bids and the awarding of contracts for the furnishing and installing of furniture in the building in question, but fails, as we read the very general allegations of this affirmative defense, to charge relator desk company with any participation therein or responsibility therefor. He also, in the form of another affirmative defense, asserts the illegality of the appropriation made by the legislature for the acquiring of this and other furniture for the building in question.

We now notice statutory provisions which have been called to our attention by counsel for the respective

parties as bearing upon the powers of the capitol com-
mittee and the manner of the committee exercising
those powers and also the powers and duties of the
governor as chairman of the capitol committee. By
ch. 69, Laws of 1909, p. 124; Rem. Comp. Stat., § 7897
[P. C. § 6265], the legislature created the "state cap-
itol commission," consisting of the governor, state
auditor, state commissioner of public lands, one mem-
ber of the state tax commission to be appointed by the
governor and three electors to be appointed by the
governor. The powers of the commission stated in
that act were with relation to the appraisal and sale
of lands of the capitol land grant, looking to the re-
plenishing of the capitol building fund and the ultimate
construction of a permanent capitol building, but did
not include the letting of contracts for, or the actual
construction of, any buildings. The act named the
land commissioner as secretary of the commission, but
did not in any manner specify which member should
be its chairman. By ch. 59, Laws of 1911, p. 319; Rem.
Comp. Stat., § 7906 [P. C. § 6275], the legislature
amended the act of 1909, and thereby made provisions
looking to the planning and ultimate construction of
a main capitol building and other capitol buildings to
be grouped around the main building. That act pro-
vided for the immediate construction of a building, as
one of the group, to be known as the Temple of Jus-
tice, and made appropriation therefor, but did not au-
thorize the contracting for, or the construction of, any
other building. It contained, among other provisions,
the following:

"All claims authorized to be paid under this act,
except as otherwise provided or intended, shall be by
vouchers signed by the governor as chairman of the
capitol commission and attested by the secretary or
active secretary thereof, and warrants drawn thereon·

by the state auditor against the capitol building fund, or other fund or appropriation authorized to be used for such purpose. '. . .

"All expenses incurred by the commission, and all claims against the capitol building fund shall be audited by the commission and presented in vouchers to the state auditor, who shall draw a warrant therefor against the capitol building fund as herein provided or out of any appropriation made for such purpose."

These provisions inferentially made the governor chairman of the commission for the performance of the ministerial duty of signing vouchers evidencing the committee's approval of expenditures thereunder, but in no other language of the act was it suggested that the governor should be chairman of the commission or have any powers touching the duties of the commission, other than as one of the members of the commission.

By ch. 34, Laws of 1919, p. 62; Rem. Comp. Stat., § 7920 [P. C. § 6297-1], the legislature authorized the capitol commission to provide generally for the erection and completion of public buildings for capitol purposes, and made a large appropriation to be expended to that end during the ensuing biennial period.

By the enactment of the administrative code, ch. 7, Laws of 1921, pp. 14, 68, §§ 8, 135; Rem. Comp. Stat., §§ 10766, 10893 [P. C. §§ 4-8, 4-135], there was created administrative committees and departments of the state government, which act, so far as need be here noticed, reads:

"Sec. 8. The governor, the state auditor and the commissioner of public lands, ex officio, shall constitute the state capitol committee, which shall have the power, and it shall be its duty, to exercise all the powers and perform all the duties now vested in, and required to be performed by, the state capitol com-mission.

"Sec. 135. From and after the thirty-first day of

March, 1921, the following offices, boards, commissions, bureaus, and departments of the state government heretofore created by law shall be and are hereby abolished, viz: . . . the state capitol commission, . . . "

There is no language in that act in the least suggesting what member of the committee should be its chairman. By ch. 22, Laws of 1921, p. 89, further appropriation was made by the legislature to carry on the capitol building construction program. By ch. 27, Laws of 1925, p. 61, further appropriation was made by the legislature,

" . . . to be expended by the state capitol committee in the completion of the construction of the administration and legislative building." [Rem. 1927 Sup., § 7921-2.]

Chapter 95, of the laws of the extraordinary session of the legislature, commencing November 9, 1925, was passed as a general appropriation bill which was approved by the governor on January 4, 1926, containing an appropriation as follows:

"For capitol buildings and grounds; from the capitol building construction fund; . . . for furniture and furnishings, $600,000." [Laws of 1925, Ex. Sess., p. 141.]

By the decision of this court rendered on November 24, 1926, in the case of *State ex rel. Bookstore v. Potts,* 141 Wash. 110, 250 Pac. 1090, it was decided that this furniture and furnishings appropriation was to be expended by the state capitol committee, the same as the appropriations theretofore made for the construction of the buildings were to be expended by the capitol commission and its successor, the capitol committee.

[1] It is apparent that the controversy between relator desk company and committeemen Clausen and Savidge, who as a majority of the committee answer

for the committee, which, we think, they clearly had the right and authority to do, is simply as to the committee causing the vouchers to be signed as effective legal vouchers; that is, as to causing the vouchers to be signed by the governor as chairman of the committee as evidencing its approval, if that be legally necessary, or signed by a majority of the committee as evidencing its approval, if that be legally sufficient. The only defense advanced by committeemen Clausen and Savidge for the committee is, in substance, that they, while constituting a majority of the committee and conceding that relator desk company is entitled to have the vouchers issued in legal and effective form, cannot compel the governor to sign the vouchers as chairman of the committee evidencing the committee's approval; and that there is no other legal method for the evidencing of the committee's approval of the vouchers. This position of committeemen Clausen and Savidge is rested upon the provision of chapter 59, Laws of 1911, above quoted, providing that payment of claims under that act

" . . . shall be by vouchers signed by the governor as chairman of the capitol commission" [Rem. Comp. Stat., § 7906.]

and warrants drawn thereon by the state auditor. This duty of the governor, under that act, manifestly was only a ministerial duty to evidence approval of that commission. This is rendered plain when we consider the further provision therein that all claims against the capitol building fund "shall be audited by the commission and presented in vouchers to the state auditor." Of course, the governor, as a member of the capitol commission, had, under that act, a voice equal to that of each of the other members of the commission in determining and auditing claims, but clearly we think he had no greater voice. We adhere to the

holding in our recent decision in State on the relation
of Clausen as a member of the state highway commit-
tee against the governor as a member of the state high-
way committee, (*State ex rel. Clausen v. Hartley, ante*
p. 135, 257 Pac. 396) that the action of a majority of an
administrative body, such as this body, is controlling,
as the action and decision of such body, upon matters
within its jurisdiction, there being no statute to the
contrary.

[2] When the legislature, in the enactment of the
state administrative code of 1921, by the language
above quoted therefrom, created the state capitol com-
mittee and thereby expressly abolished the then exist-
ing state capitol commission, we think the legislature
not only abolished the state capitol commission, but
also abolished the office of chairman of that commis-
sion and took away from its chairman all statutory
ministerial power and duty which he possessed as such
chairman, and hence took away from him the statu-
tory duty and power of signing vouchers to evidence
approval of expenditures by the capitol commission
or its successor the capitol committee. We may assume
that the capitol committee could authorize, and has
legally authorized, the governor to evidence its ap-
proval of expenditures by his signature to vouchers
as its chairman, but that is of no consequence here.
That does not argue that the committee may not legal-
ly evidence its approval in some other appropriate
manner. The point is that the governor's signature
as chairman is not now legally necessary to evidence
the final approval of expenditures by the capitol com-
mittee. He is chairman of the committee only by vir-
tue of the choice of a majority of the members, and
not because the statute makes him the chairman of the
committee. It seems to us that these considerations
lead to the conclusion that the vouchers here in ques-

tion may be lawfully signed by any two members of the state capitol committee, they constituting a majority of the committee, and thereby legally and effectually evidence the committee's approval of the vouchers and thus legally authorize the drawing of warrants by the state auditor accordingly.

[3] Now, what of the governor's response to the petition of relator desk company? His demurrer challenging the jurisdiction of the court over him in the premises seems to be rested upon the theory that he is not subject to mandate from this court, because he is the chief executive officer of the state. It might be well argued that the following unambiguous language of § 4, Art. 4, of our state constitution: ''The supreme court shall have original jurisdiction in . . . mandamus as to all state officers,'' effectually negatives this theory, in so far as the governor's purely ministerial statutory duty as a mere member of the capitol committee is concerned. But we need not pursue this interesting inquiry, since it seems now apparent from what we have already said that the governor's action here sought is not legally necessary to the securing of the claimed rights of relator desk company.

[4] The governor's denial of the validity of the furniture contract in question, in so far as such denial rests upon alleged unfair practices indulged in by the committee and the architects in connection with the invitations for bids and the awarding of contracts, we think, does not present an effective defense in this proceeding. We are of the opinion that we must take the facts admitted and disclosed by the answer of committeemen Clausen and Savidge as conclusive in this particular proceeding; that is, they being a majority of the committee and answering for the committee, their answer is in law the answer of the committee in this

proceeding. Indeed, the governor seems to be resisting mandamus only as against himself.

[5] The governor's affirmative defense challenging the legality of the appropriation made for furniture and furnishings, against which appropriation it is sought to charge the furniture claims of relator desk company, suggests a question of law which, even in this proceeding, might seem to call for notice and discussion here, though not presented by committeemen Clausen and Savidge in behalf of the committee, since it presents the question of law as to whether or not the expenditure of our Federal capitol land grant proceeds can be lawfully made for furnishing our capitol buildings. The legality of that appropriation, however, was upheld by this court in its decision rendered in the case of *State ex rel. Bookstore v. Potts, supra.* That decision is attacked by counsel for the governor, both because, as it is alleged, it was rendered in a purported controversy in this court, which was in fact not real, and also because the conclusions of the majority there announced are unsound. Those legal questions were well and elaborately presented to us in that case. We adhere to the conclusion of the majority in the decision rendered therein.

[6] Some contention is made by counsel appearing for the governor that the administrative code of 1921, making the state auditor a member of the capitol committee, is unconstitutional in so far as it makes the state auditor a member of the capitol committee. In that behalf, § 20 of Art. 3 of the constitution is invoked, reading as follows: "The auditor shall be auditor of public accounts." The argument seems to be that, because of this duty, the auditor cannot legally be assigned the alleged inconsistent duties incident to being a member of the capitol committee, which has within its power the expenditure of large sums of money

incident to the construction of the capitol buildings. The arguments advanced by counsel for the governor, it seems to us, are rested wholly upon questions of legislative policy. The contention is but briefly argued by counsel. We are not persuaded that there are any constitutional grounds, cognizable by the court, against the state auditor being a member, *ex officio,* of the capitol committee.

In view of the attitude and manifest willingness of committeemen Clausen and Savidge to sign these vouchers as evidencing the approval thereof by the committee, if it be the law, as we hold it to be, that such manner of evidencing the approval of the vouchers by the committee is legally effectual to authorize the issuance of warrants thereon, we at present see no necessity for the issuance of a formal writ of mandate to that end. So, for the present, we adjudge that it is the duty of committeemen Clausen and Savidge, in view of their concession in this case that relator desk company is entitled to have the approval of the vouchers legally evidenced, that they evidence such approval by their own signatures as a majority of the committee. However, should they, as a majority of the committee, decline to proceed in this manner, we will consider further, upon appropriate application, as to whether or not a formal writ of mandate should issue in some appropriate form in this proceeding.

FRENCH, MITCHELL, ASKREN, MAIN, and FULLERTON, JJ., concur.

TOLMAN and HOLCOMB, JJ., concur in the result.

MACKINTOSH, C. J. (concurring).—While not yet convinced that the decision in *State ex rel. Bookstore v. Potts,* 141 Wash. 110, 250 Pac. 1090, was correct, I agree with the result arrived at in this case.