[No. 49799–1.   En Banc.   June 28, 1984.]

THE COUNTY OF SKAMANIA, ET AL, *Respondents,* v.
THE STATE OF WASHINGTON, ET AL,
*Appellants.*

*Kenneth O. Eikenberry, Attorney General,* and *Theodore O. Torve, Senior Assistant,* for appellant State.

*Bogle & Gates, John T. Piper,* and *Patrick S. Brady,* for appellants Anderson & Middleton Lumber Co., et al.

*Robert K. Leick* and *Davis, Wright, Todd, Riese & Jones,* by *Daniel B. Ritter, Marvin L. Gray, Jr.,* and *Jeffrey B. Van Duzer,* for respondents County of Skamania, et al.

*Kenneth O. Eikenberry, Attorney General, James B. Wilson, Senior Assistant,* and *Robert E. Patterson, Assistant,* for respondent State.

*Michael D. Axline* and *Roy Kussman* on behalf of Washington Environmental Council, amici curiae for respondents.

BRACHTENBACH, J.—This is an appeal from a declaratory judgment holding unconstitutional the Forest Products Industry Recovery Act of 1982. The main issue is whether the Act, by modifying contracts for the sale of timber from trust lands, violated the State's fiduciary duties to the trust beneficiaries. The trial court held that it did; we affirm.

# I

## A. Facts

This case concerns the sale of timber from state lands. Of the 18 million acres of commercial timberland in Washington, approximately 10 percent is held by the State of Washington in trust for various beneficiaries. The bulk of this land was granted to the State pursuant to the Washington Enabling Act, 25 Stat. 676 (1889). It is held in trust for the common schools, the University of Washington and others, pursuant to the enabling act and article 16 of the Washington Constitution. These are known as "federally granted" lands. The remaining lands were deeded by various counties to the State after tax foreclosures, pursuant to RCW 76.12.030. That statute provides that these forest board transfer lands are to be "held in trust" by the State, and that proceeds from the management of these lands go to the grantor counties, after deducting administrative expenses. RCW 76.12.030(1), (2).

The Department of Natural Resources (DNR) generates income for the trusts by selling to private companies the right to cut timber from the trust lands. These sales are by public auction. The contracts between the purchaser company and the State generally provide that the company will cut the timber within 2 to 3 years. The company is required to post a relatively small performance bond and pay a 10 percent deposit, but does not pay the remaining purchase price until the timber is actually cut. As a result, the bids are based on what the company anticipates lumber prices will be 2 or 3 years hence. The contracts are thus essentially future contracts, with the State bearing the risk of rising prices, and the purchaser companies bearing the risk of falling prices. An additional feature of these contracts is that the company may postpone the harvest by paying an extension fee, calculated on a percentage of the contract price plus interest.

The contracts at issue in this case were made between January 1, 1978, and July 1, 1980. The DNR placed an unusually large amount of timber on the market during this

period, to compensate for the relatively few sales it had conducted in 1977 and early 1978. The bids for these contracts were made on the assumption that inflation would go down and that housing starts would go up in 1981 and 1982. When the opposite occurred, lumber prices plummeted. Whereas the purchase price under the contracts ranged from $300 to $800 per 1,000 board feet, the market value was $175 by early 1982. The contracts obviously could not be operated profitably; the trial court found that if the companies had been required to perform according to their contracts they would have faced losses of approximately $100 million (less if the contracts were extended to await an improvement in market conditions). The possibility that the companies would willingly perform according to the contracts became more doubtful. By early 1982, 15 contracts had been defaulted, and several companies had brought suit challenging the enforceability of the contracts.

The Legislature responded to this problem in 1982 with the Forest Products Industry Recovery Act of 1982 (the Act), codified at RCW 79.01.1331–.1339. Essentially, sections 6 and 7 of the Act allow purchasers to default on their obligations under their contract, and sections 4, 5 and 9 allow the purchasers to more easily modify or extend their contracts.

Section 6 of the Act, codified at RCW 79.01.1335, permits purchasers to terminate their contracts if they pay a $2,500 administrative fee and forfeit the initial 10 percent deposit. According to the trial court, the face value of the purchasers' remaining obligations on contracts actually terminated under section 6 was approximately $157 million. Even after allowing for the 10 percent deposit and the market value of the timber returned to the State, "the face amount of the contractual claims released under Section 6 totalled in the range of $70,000,000 to $90,000,000." Section 6 also released over $8 million secured by performance bonds.

Section 7, codified at RCW 79.01.1336, permits purchasers who had defaulted prior to the Act to reinstate their contracts, and then to default the contract under section 6.

The face value of the contracts terminated under section 7 was $3,826,459, as found by the trial court.

Section 4, codified at RCW 79.01.1333, permits a purchaser to obtain an extension by harvesting, or agreeing to harvest, a portion of that contract timber or any other qualifying contract timber the purchaser holds. The purpose of this provision was to provide an incentive to harvest immediately, and thereby increase "near–term cash flow." In essence, this section gave the purchaser a 1–day free extension for every day the purchaser performed according to the contract. Regarding this provision the trial court stated: "[n]othing in the Act or the regulations ensures that the purchaser thereby performs or undertakes any obligation he did not already have under his contracts." Pursuant to section 4 the State granted "free" extensions valued at nearly $1 million.

Sections 5 and 9 of the Act allow purchasers to extend the performance date of their contract according to a credit formula. The State has granted such credits and extensions under section 5 worth nearly $10 million.

### B. Proceedings Below

Skamania County sued the State of Washington, alleging that the Act was a breach of the State's fiduciary duties to the trust beneficiaries and a violation of several state and federal constitutional provisions. Anderson & Middleton Lumber Company and Murray Pacific Corporation, two purchaser companies eligible for relief under the Act, were permitted to intervene as defendants. The State Board of Education and the Board of Regents for the University of Washington were permitted to intervene as plaintiffs.

The trial court granted partial summary judgment to defendants on six of Skamania's theories. After trial on the remaining issues, the trial court held: (1) that the Act was invalid as a breach of the trustee's duty of undivided loyalty and duty to act prudently; (2) that the Act was a gift, invalid under article 8, section 5 of the state constitution; and (3) that the Act was special legislation, invalid under

article 2, section 28(10) of the state constitution. We granted direct review.

## II

■ The first issue we must address concerns the rules governing our review of legislation enacted by a coordinate branch of government. A statute is presumed to be constitutional. The party challenging the statute's validity bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt. *In re Marriage of Johnson,* 96 Wn.2d 255, 258, 634 P.2d 877 (1981); *Bellevue v. State,* 92 Wn.2d 717, 600 P.2d 1268 (1979). Where the statute is passed pursuant to the police power, the only limitation upon the Legislature is that the statute must reasonably tend to correct some evil or promote some interest of the State, and not be contrary to any constitutional provision. *Shea v. Olson,* 185 Wash. 143, 153, 53 P.2d 615, 111 A.L.R. 998 (1936).

■ Where the statute deals with state trust lands, however, the permissible goals of the legislation are more limited. The federal land grant trusts were created specifically to benefit certain named beneficiaries. *See* Washington Enabling Act § 11, 25 Stat. 676 (1889), *amended by* Act of August 11, 1921, 42 Stat. 158, and Act of May 7, 1932, 47 Stat. 150; *see also* Const. art. 16, § 1. Every court that has considered the issue has concluded that these are real, enforceable trusts that impose upon the State the same fiduciary duties applicable to private trustees. For example, in *Lassen v. Arizona ex rel. Ariz. Hwy. Dep't,* 385 U.S. 458, 17 L. Ed. 2d 515, 87 S. Ct. 584 (1967), the Supreme Court, interpreting the Arizona Enabling Act, held that Arizona could not transfer easements across trust lands without compensation to the trust. The Court stated that the Arizona Enabling Act "contains 'a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose.'" *Lassen,* at 467 (quoting *Ervien v. United States,* 251 U.S. 41, 47, 64 L. Ed. 128, 40 S. Ct. 75 (1919)). Although *Lassen*

involved a different enabling act, the principle of *Lassen* applies to Washington's enabling act. *See United States v. 111.2 Acres of Land,* 293 F. Supp. 1042 (E.D. Wash. 1968), *aff'd,* 435 F.2d 561 (9th Cir. 1970). There the court stated:

> There have been intimations that school land trusts are merely honorary, that there is a "sacred obligation imposed on (the state's) public faith," but no legal obligation. These intimations have been dispelled by Lassen v. Arizona . . . This trust is real, not illusory.

(Citations omitted.) 293 F. Supp. at 1049. For cases in which courts have applied private trust principles to federal land grant trusts, *see, e.g., State ex rel. Hellar v. Young,* 21 Wash. 391, 58 P. 220 (1899); *Oklahoma Educ. Ass'n v. Nigh,* 642 P.2d 230, 236 (Okla. 1982); *State v. University of Alaska,* 624 P.2d 807, 813 (Alaska 1981); *State ex rel. Ebke v. Board of Educ. Lands & Funds,* 154 Neb. 244, 248–49, 47 N.W.2d 520 (1951).

The forest board transfer lands are also held by the State in trust. RCW 76.12.030 states that when counties transfer this land to the state, "[s]uch land shall be held in trust and administered and protected by the board as other state forest lands." This statute, like the enabling act, imposes upon the State similar fiduciary duties in the management and administration of the forest board transfer lands.

The appellants argue that by applying trust principles to the legislation, the burden impermissibly shifts to the State to prove the Act's validity. This is not the case. The burden remains on the challenger to prove the statute's invalidity, and all reasonable inferences and presumptions will be made in favor of the legislation's constitutionality. We merely hold that when the State enacts laws governing trust assets, its actions will be tested by fiduciary principles. What this means in practice is that the range of permissible goals is narrower than when the Legislature exercises its police powers; it does not alter the challenger's burden to prove the statute's invalidity beyond a reasonable doubt.

The trial court in this case applied trust principles to the

Act, and held that the Act violated (1) the State's duty of undivided loyalty to the trust beneficiaries; and (2) the State's duty to act prudently. Keeping in mind the presumption of constitutionality, then, the questions for this court on review are: (1) Have the plaintiffs proved beyond a reasonable doubt that the Legislature acted with a divided loyalty?; and (2) If the Legislature acted solely to benefit the trusts do any set of facts exist which justify the Legislature's conclusion that the Act was in the trusts' best interests? (duty to act prudently). These related issues will be discussed separately below.

### A. Duty of Undivided Loyalty

■■ A trustee must act with undivided loyalty to the trust beneficiaries, to the exclusion of all other interests. G. Bogert, *Trusts and Trustees* § 543, at 197–98 (2d ed. 1978). In the context of this case this means that when the State transfers trust assets such as contract rights it must seek full value for the assets. Const. art. 16, § 1. It may not sacrifice this goal to pursue other objectives, no matter how laudable those objectives may be. *Ervien v. United States, supra.* The plaintiffs contend that the primary purpose and effect of the Act was to benefit the forest products industry and the state economy in general, at the expense of the trust beneficiaries.

The State contends that the Act was a prudent response to an unprecedented emergency. The timber contracts were so overpriced that many companies were expected to sue to avoid performance; those attempting to perform faced the possibility of bankruptcy. Both prospects would delay harvest of the timber and would produce no short–term income to the. trusts. Thus, the State argues, the Legislature could conclude that enforcing the contracts would involve too much risk and uncertainty in litigation, hurt competition in the timber industry and thereby reduce the price of timber in the future, and produce no immediate income to the trusts. By modifying the contracts to encourage performance and preserve the timber industry, it is

argued that the Legislature acted in the best interests of the trusts, both for the long term and the short term. The State further notes that this court must give great deference to the Legislature's action. *Shea v. Olson,* 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936).

The experts who testified disagreed on the economic effects of the legislation. The chief of budget and economic analysis for the DNR stated that at the time this legislation was being considered his department informed the Legislature that the proposed Act was not in the best interests of the trusts. His estimate in March 1982 was that the Act would result in a loss of $69.5 million, and that the harvest–incentive measures would not materially affect the amount of timber harvested. A University of Washington economics professor also stated that he believed that the Act would result in "substantial losses" to the trust. On the other hand, a consultant to the forestry industry and government agencies testified that enforcing the contracts would result in bankruptcies and disruption of the industry, causing revenues and harvests to decline. In his view "the revenue which would be generated under the Act would be at least equal to or greater than what [DNR] would get if they took no action."

At the conclusion of the trial the court found:

40. From the face of the Act (particularly Section 6) and the evidence at trial the court finds, without a doubt, that the legislature acted with a divided loyalty in adopting the Act. The facts support only the conclusion that the legislature acted primarily for the purpose of benefiting the forest products industry (the contract purchasers), rather than to benefit the trust beneficiaries.

41. The court finds that avoidance of the risks and delays of litigation was not the legislature's principal purpose in adopting the Act.

42. While the Court finds that the legislature did consider the interests of the trust beneficiaries in its deliberation on the Act, its primary purpose in enacting the Act was to benefit the timber industry and the State as a whole. The Act released valuable contractual claims, resulting in a detriment to the trusts.

We agree with the trial court. A brief review of the Act in operation shows that the Act provides direct, tangible benefits to the contract purchasers, at the expense of the trust beneficiaries. Section 6 of the Act released the purchasers from all their contractual obligations. All the State received in return was the 10 percent deposit which, according to the terms of the contract, the State was entitled to receive in any event.[1] Section 7 allowed companies that had previously defaulted to pay a fee, reinstate the contract, and then be released of liability under section 6. All the State received in return was the extension fee and the 10 percent deposit which, again, the purchasers were already obligated to pay. Finally, section 4 allows for free extensions of the contracts. In return the State receives the harvest of the timber, something the purchaser was already obligated to do.

In short, the Act released over $90 million in contract rights (including $8 million secured by performance bonds), and the State received very little in return. The Act prevented the DNR from attempting to enforce the contracts, or to renegotiate the contracts on an individual basis. Renegotiation would have allowed the DNR to provide relief to the companies that needed it most, without resorting to the wholesale sacrifice of the trusts' contract rights. We think the Act falls far short of the State's constitutionally imposed duty to seek "full value" for trust assets. The conclusion is inescapable that the primary purpose and effect of this legislation was to benefit the timber industry and the state economy in general, at the expense of the trust beneficiaries. This divided loyalty constitutes a breach of trust.

Our holding is consistent with a host of cases from other jurisdictions involving school trust lands. To our knowledge, every case that has considered similar issues has held

---

[1]The purchasers were also required to pay a $2,500 administrative fee. These fees were consumed in administering the Act, however, so none of the trust beneficiaries received any of this money.

that the State as trustee may not use trust assets to pursue other state goals. In *Ervien v. United States,* 251 U.S. 41, 64 L. Ed. 128, 40 S. Ct. 75 (1919), the State of New Mexico used funds obtained from trust assets to advertise and promote the State of New Mexico. The State argued that this advertising had the effect of "enhancing of the prospective prices to be derived" from later sales of trust assets, and that the program therefore benefited the trusts. The Supreme Court held that this arrangement violated the State's fiduciary duty to the trusts, since the funds benefited *both* trust lands and nontrust lands. The Court stated:

> There is in the Enabling Act a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose.

251 U.S. at 47. Similarly, the Arizona Supreme Court has held that school trust lands could not be sold without public auction, even to another state agency. *Gladden Farms, Inc. v. State,* 129 Ariz. 516, 633 P.2d 325 (1981). The court stated:

> However worthwhile and desirable this sale may be for the humanitarian purposes for which it is made, we do not believe that the sale without auction and bid assures the "highest and best" price that the [Arizona] Enabling Act requires. *The Enabling Act does not allow trust lands to be used for the purpose of subsidizing public programs no matter how meritorious the programs.*

(Italics ours.) 129 Ariz. at 521. *See also United States v. 78.61 Acres of Land,* 265 F. Supp. 564 (D. Neb. 1967) (school lands must be sold or leased for the benefit of common schools as opposed to general public benefit); *State v. University of Alaska,* 624 P.2d 807 (Alaska 1981) (lands held in trust for University must be used for exclusive benefit of University; they may not be set aside as parkland, where they would be used solely for recreational purposes); *State ex rel. Ebke v. Board of Educ. Lands & Funds,* 154 Neb. 244, 47 N.W.2d 520 (1951) (leasing scheme that favored existing lessees, without seeking higher rental

value, constituted divided loyalty).

## B. Duty To Act Prudently

A trustee has a duty to manage trust assets prudently; this includes using reasonable diligence in pursuing contract claims. G. Bogert, *Trusts and Trustees* § 592, at 408 (2d ed. 1978). Recently we held that a trustee breached its fiduciary duty by disposing of a trust asset without obtaining "the best possible price" for the asset. *Allard v. Pacific Nat'l Bank,* 99 Wn.2d 394, 406, 663 P.2d 104 (1983).

The Act in this case released valuable contract rights held by the DNR. The primary justification for this action was based on the testimony of a forestry consultant, that is, that the Act was necessary to preserve competition, maintain timber prices in the future, and encourage timely contract performance. The trial court held that this justification was too speculative and uncertain to justify the termination of valuable contract rights. The court relied on *Lassen v. Arizona ex rel. Ariz. Hwy. Dep't,* 385 U.S. 458, 17 L. Ed. 2d 515, 87 S. Ct. 584 (1967). In *Lassen* the Supreme Court of Arizona had held that the State Land Department could grant easements across state trust land without compensation to the trust beneficiaries. The Arizona court reasoned that it could be conclusively presumed that highways constructed on the easements would always enhance the value of surrounding lands in amounts equal to the value of the area taken. *See* 385 U.S. at 460. The United States Supreme Court reversed, holding that the State must receive full compensation for the easement granted. In so holding, the Court expressly rejected the United States' argument that enhancement value should be considered in determining the actual compensation payable to the trust. The Court said:

> [W]e think that the more particularized showing of enhancement advocated by the United States, resting as it largely would upon the forecasts of experts which by nature are subject to the imponderables and hazards of the future, also falls short of assuring accomplishment of the basic intendment of Congress.

385 U.S. at 468–69. While *Lassen* involved a different enabling act, the Washington Enabling Act and the Washington Constitution also require the State to seek the full market value of the particular interest being sold. Washington Enabling Act § 11, 25 Stat. 676 (1889), *amended by* Act of August 11, 1921, 42 Stat. 158, and Act of May 7, 1932, 47 Stat. 150; Const. art. 16, § 1.

The State seeks to distinguish *Lassen,* arguing that in *Lassen* Arizona gave away easements with a certain value in exchange for uncertain enhancement value of the surrounding lands. The State contends that in this case the contracts had an uncertain value, as did the projected benefits from the Act; under such circumstances the legislative choice between two uncertainties should be respected. As respondents correctly note, however, the easements in *Lassen* had no certain appraised value. By contrast, each contract in this case was a commitment to purchase a specific amount of timber for a specific price within a specific time.

We think that this Act, like the legislation in *Lassen,* fails to satisfy the constitutional requirement that the State seeks full market value for trust assets. The testimony of a forestry consultant is simply too speculative and conjectural to justify the Act's provisions. We hold that no prudent trustee could conclude that the unilateral termination of these contracts was in the best interests of the trusts.

### III

Because we affirm the trial court's conclusion that the Act is a breach of the State's fiduciary duty under Const. art. 16, § 1, we do not decide whether the Act is a gift of public property under Const. art. 8, § 5, or whether it is special legislation under Const. art. 2, § 28(10).

Finally, respondents have requested attorney fees. The trial court reserved ruling on their request for fees incurred at trial, so the only issue before us is whether they are entitled to attorney fees for costs incurred in this appeal. We decline to rule on this issue, and instead remand the

matter to the trial court to determine whether fees are appropriate. RAP 18.1.

WILLIAMS, C.J., ROSELLINI, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., and CUNNINGHAM and JAMES, JJ. Pro Tem., concur.