**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILE

For the current opinion, go to https://www.lexisnexis.com/clients/wareports.

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 21, 2022

_Conzález C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 21, 2022

ERIN L. LENNON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CONSERVATION NORTHWEST, WASHINGTON ENVIRONMENTAL COUNCIL, and OLYMPIC FOREST COALITION, | No. 99183-9 |
| Appellants, | En Banc |
| MIKE TOWN, an individual; HOLLY KOON and MAX DUNCAN, a married couple; LINDA LORENZ, an individual, PETER BAHLS, an individual; SCOTT WALLACE, an individual, and MARCY GOLDE, an individual, | Filed : July 21, 2022 |
| Plaintiffs, | |
| v. | |
| COMMISSIONER OF PUBLIC LANDS, HILARY FRANZ (in her official capacity), WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, and the WASHINGTON STATE BOARD OF NATURAL RESOURCES, | |
| Respondents, | |
| WAHKIAKUM COUNTY, PACIFIC COUNTY, SKAMANIA COUNTY, MASON COUNTY, LEWIS COUNTY, CONCRETE SCHOOL DISTRICT, QUILLAYUTE VALLEY SCHOOL DISTRICT NO. 402, NASELLE-GRAYS RIVER SCHOOL DISTRICT, DARRINGTON SCHOOL DISTRICT, CLALLAM COUNTY FIRE DISTRICT | |

No. 99183-9

NO. 4, CLALLAM COUNTY FIRE
DISTRICT NO. 5, PORT OF PORT
ANGELES, AMERICAN FOREST
RESOURCE COUNCIL, and CITY OF
FORKS,

                    Intervenor-Respondents.

)
)
)
)
)
)
)
)

WHITENER, J.—The respondents in this case, the Commissioner of Public Lands, Washington State Department of Natural Resources, and the Board of Natural Resources (collectively DNR) manage approximately three million acres of forested state-owned lands. Although the precise acreage has fluctuated over time, several hundreds of thousands of acres of land were initially granted to the State of Washington by the federal government pursuant to the Omnibus Enabling Act of 1889, ch. 180, 25 Stat. 676 (Enabling Act). This significant land grant was made "for the support of common schools" and other state institutions. Individual counties have also granted land to the State pursuant to RCW 79.22.040 with the explicit understanding that they are held in trust for the benefit of those counties (county beneficiaries). RCW 79.64.110(1) (certain percentage of revenue generated from leasing or selling resources from these lands must be distributed to county that granted land in question). The case before us concerns DNR's land management strategies applicable to these federal land grants ("state lands") and county land

2

No. 99183-9

grants ("forest board lands"), which involves harvesting timber from these lands to generate revenue for state institutions and counties.

The petitioners in this case, a group of individuals and nonprofit organizations (collectively Conservation NW), challenge DNR's land management strategies on the grounds that they violate the mandate under Washington Constitution article XVI, section 1 that "[a]ll the public lands granted to the state are held in trust for all the people." Conservation NW argues that DNR's strategies prioritize maximizing revenue from timber harvests and undercut its obligation to manage granted lands for the broader public interest, which would be better served by prioritizing conservation and efforts to mitigate climate change, wildfires, and land erosion. DNR contends that it has a trustee obligation to manage the state and forest board lands specifically for the state institutions enumerated in the Enabling Act and the county beneficiaries. DNR acknowledges that its land management strategies do generate revenue but not "at the expense of forest health," as Conservation NW suggests. Br. of Resp'ts at 32. DNR emphasizes that its strategies necessarily comply with other laws, such as the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and the sustained harvest act, RCW 79.10.300-.340, which are designed to restrict timber harvests to limit negative effects on our ecosystem.

The trial court dismissed Conservation NW's lawsuit against DNR based on its conclusion that *County of Skamania v. State*, 102 Wn.2d 127, 685 P.2d 576

3

(1984), conclusively established that DNR was a trustee under the Enabling Act. As discussed in Section III.A, *infra*, while *Skamania* correctly concluded DNR is obligated as a trustee to manage state lands for the beneficiaries enumerated in the Enabling Act, its holding is not determinative of the issues before us.

Although the Enabling Act did not use express trust language, its terms restricting the disposition of state lands and the resources derived from those lands demonstrate that the federal government intended the lands to be held in trust for the benefit of enumerated state institutions. Our constitution, including article XVI, section 1, was drafted in accordance with the provisions of the Enabling Act. The general provision that granted lands must be held in trust for all Washingtonians does not preclude DNR from exercising its discretion to generate revenue from timber harvests on granted lands. Of note, DNR is expressly required by statute to harvest timber from forest board lands and *may* conduct other compatible activities in its discretion. As DNR emphasizes, generating revenue from timber harvests helps boost local economies and maintain state institutions. Because the general population of Washington stands to gain from increased economic, educational, and governmental stability, DNR's land management strategies do not violate article XVI, section 1. Although there are likely multiple alternative ways to generate revenue from state lands, because DNR's land management strategies are neither

4

No. 99183-9

unconstitutional nor arbitrary and capricious, we are not empowered to weigh in on

DNR's exercise of its discretion in managing state and forest board lands.

We affirm the trial court's dismissal of the case on the alternate grounds set

forth below.

I.    FACTS AND PROCEDURAL HISTORY

In January 2020, Conservation NW filed suit against DNR,[1] challenging two

resolutions approved by the Board of Natural Resources in December 2019, which

relate to the conservation of marbled murrelet[2] habitat as well as timber harvests on

state and forest board lands. The first was "Resolution No. 1559," the Marbled

Murrelet Long-Term Conservation Strategy (Marbled Murrelet Strategy), which

replaced an interim conservation plan in DNR's 1997 habitat conservation plan with

a long-term strategy to minimize and mitigate "any incidental take" of marbled

murrelet habitat through DNR's other activities, including timber harvests, in

compliance with the Endangered Species Act, 16 U.S.C. § 1539. The second was

"Resolution No. 1560," the sustainable harvest level calculation ("Harvest

Calculation"), which set the "sustainable harvest level" for timber culled from

"forested State Trust lands in Western Washington" in accordance with the public

---

[1] Wahkiakum County and several other parties were permitted to intervene as defendants.
[2] The marbled murrelet is a type of seabird that is recognized as a federally "threatened" species. *Marbled Murrelet*, WASH. STATE DEP'T OF NAT. RES., https://www.dnr.wa.gov/marbledmurrelet [https://perma.cc/45JS-NJVD].

No. 99183-9

lands act, RCW 79.10.320. Clerk's Papers at 277-79. The Harvest Calculation set an annual harvest level of 465 million board feet of timber for fiscal years 2015-2024 to compensate for an arrearage in timber volumes from previous years, while also complying with DNR's other policies, including the Marbled Murrelet Strategy.

Conservation NW alleged that the Marbled Murrelet Strategy and the Harvest Calculation violated DNR's trust mandate under article XVI, section 1 to hold "[a]ll the public lands granted to the state . . . in trust for all the people." *Id*. at 10-12 (first alteration in original). Conservation NW sought (i) declaratory judgment that DNR was required under article XVI, section 1 "to not only manage forests to produce revenue from timber harvest[s], but also to promote the broader public interest," (ii) constitutional writs of certiorari to review the Marbled Murrelet Strategy and the Harvest Calculation, and (iii) invalidation of the two resolutions. *Id*. at 10, 62. The Thurston County Superior Court dismissed the case on the merits, reasoning that *Skamania* established that DNR was obligated as a trustee to manage state and forest board lands for the state institutions enumerated in the Enabling Act and the county beneficiaries.

Conservation NW timely sought direct review from this court, arguing that the trial court's dismissal was erroneous because *Skamania*'s holding is limited to timber sales but not DNR's management of granted lands. Conservation NW argues that DNR does not owe a private trust duty that mandates revenue maximization for

6

No. 99183-9

the benefit of the state institutions enumerated in the Enabling Act or the county beneficiaries that have granted land under RCW 79.22.040; instead, Conservation NW argues, DNR's trustee obligation is to manage all granted lands for the benefit of "all the people" of Washington pursuant to article XVI, section 1. Statement of Grounds for Direct Review at 14-15. Conservation NW urges that prioritizing other activities—instead of timber harvests—that would mitigate the damaging effects of climate change, deforestation, and habitat degradation would better serve the interests of "all the people."

DNR contends that there is a clear trust obligation created by the Enabling Act and RCW 79.22.040 that requires it to manage state and forest board lands for the benefit of enumerated state institutions and counties. DNR urges that its land management strategies do not conflict with its broader trust mandate under article XVI, section 1 because timber harvests help fund public institutions and boost local economies, and the general population of Washington (i.e., "all the people") also derives a benefit from the availability of timber-related jobs as well as having stable and well-funded public systems of education and governance.

No. 99183-9

## II. ISSUES

1. Did the Enabling Act create a trust?

2. Do DNR's land management strategies violate its obligations under article XVI, section 1 such that its Harvest Calculation and Marbled Murrelet Strategy should be reversed?

## III. ANALYSIS

### A. Creation of a trust under the Enabling Act

The first issue before us is whether the Enabling Act created a trust, which is a question of statutory interpretation we review de novo. *Williams v. Tilaye*, 174 Wn.2d 57, 61, 272 P.3d 235 (2012).[3] Our primary objective is to give effect to the legislative intent behind the Enabling Act by examining the plain language of the statute and giving "it its reasonable interpretation." *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004). We consider the ordinary meaning of the words of the text "as determined at the time they were drafted" and may refer to historical context of the provisions in question to guide our analysis. *Id*. With respect to the Enabling Act, specifically, its provisions "should be given a

---

[3] The parties do not contest that DNR has trust obligations to the county beneficiaries who granted land under RCW 79.22.040. One amicus urges that forest board lands are not implicated in article XVI, section 1 because they are the product of statute. *See* Br. of Amicus Curiae Wash. State Ass'n of Counties at 20-25. Although Conservation NW asserts that forest board lands are only "indirectly" affected by article XVI, section 1, we do not deem this to be a concession that forest board lands are not implicated in this appeal. Article XVI, section 1 broadly applies to "[a]ll the public lands granted to the state." While this could only logically apply to the federal land grants at the time of drafting, the language does not limit its constitutional mandate to those lands and those lands alone. WASH. CONST. art. XVI, § 1 (asserting all public lands granted to State are held in trust and later applying restrictions on disposition of land specifically granted by federal government). We therefore consider DNR's obligations under article XVI, section 1 with respect to both state and forest board lands, taking into account statutory requirements applicable specifically to forest board lands as necessary.

8

No. 99183-9

liberal, and not a narrow and restricted, construction for the purpose of carrying out its purpose and intent." *State ex rel. Bookstore v. Potts*, 141 Wash. 110, 117, 250 P. 1090 (1926).

Several previous cases have referred to the lands granted by the Enabling Act as being held in trust by the State. *See, e.g.*, *id.* at 111-12 ("[T]he Enabling Act . . . under which Washington territory became the state of Washington, made donations of the public land owned by the Federal government to the state for various purposes, one of which was for public buildings at the state capital. Under that act, to the land thus donated the state became the absolute owner of the title, which it holds in trust for the purposes therein specified."); *State ex rel. State Capitol Comm'n v. Clausen*, 134 Wash. 196, 201, 235 P. 364 (1925) ("Although the state owns the lands, it holds them in trust for a particular purpose . . . 'there is a sacred obligation imposed on its public faith.'" (internal quotation marks omitted) (quoting *Alabama v. Schmidt*, 232 U.S. 168, 173, 34 S. Ct. 301, 58 L. Ed. 555 (1914))); *see also Pub. Util. Dist. No. 1 of Okanogan County v. State*, 182 Wn.2d 519, 546-47, 550, 342 P.3d 308 (2015) (*PUD No. 1*) ("We have interpreted [section 17 of the Enabling Act and article XVI, section 1] as creating an enforceable trust with concomitant fiduciary duties on the State."); *Skamania*, 102 Wn.2d at 132 ("Every court that has considered the issue has concluded that [the federal land grants under the Enabling Act] are real, enforceable trusts that impose upon the State the same fiduciary duties applicable to

9

No. 99183-9

private trustees."); *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 650 & n.1, 466 P.2d 508 (1970) (referring to federally granted lands as "public trust lands" dedicated to support enumerated state institution beneficiaries in the Enabling Act). No opinion has examined, however, precisely how the Enabling Act created a trust when it did not use any express trust language; many of these opinions relied instead on reasoning from other jurisdictions (and other enabling acts) to support the conclusion that a trust exists. *Bookstore*, 141 Wash. at 111-12 (relying on *Clausen*, 134 Wash. at 201-02, which referenced Supreme Court and Fifth Circuit Court of Appeals cases considering land grants to states of Alabama and Louisiana); *PUD No. 1*, 182 Wn.2d at 547-58 (referencing Supreme Court decision interpreting Arizona enabling act); *Skamania*, 102 Wn.2d at 132, 137 (referencing decisions interpreting Arizona, New Mexico, and Oklahoma enabling acts and other federal land grants in Alaska and Nebraska).

The Supreme Court's decision in *Papasan v. Allain*, 478 U.S. 265, 269-70, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986), made clear that other jurisdictions' interpretation of their enabling acts does not necessarily determine DNR's obligations under Washington law. As the Supreme Court highlighted, despite significant overlap in enabling acts over the decades, only some used express trust language while others lacked such language and seemed to be "outright gifts" to be held in fee absolute. *Id*. at 270, 289 n.18. Because "the interest transferred to the

10

No. 99183-9

State depends on the federal laws that transferred that interest," we must examine this state's Enabling Act to determine whether it created a trust. *Id*. at 289 n.18 ("If the federal law provided for the transfer of an absolute fee interest, the lands are owned outright by the State. On the other hand, if the federal law created a trust with the State as a trustee, the State is bound to comply with the terms of that trust.").

"A trust is created only if the settlor properly manifests an intention to create a trust relationship." RESTATEMENT (THIRD) OF TRUSTS § 13 (AM. L. INST. 2003); *accord In re Est. of Madsen*, 48 Wn.2d 675, 678, 296 P.2d 518 (1956) (trust requires "explicit declaration of trust or circumstances which show beyond doubt that a trust was intended to be created"). Trusts in real property must be evidenced in writing, *Pacheco v. Mello*, 139 Wash. 566, 573-74, 247 P. 927 (1926), but the settlor does not need to use express trust language (i.e., "trust" or "trustee") to create a trust. RESTATEMENT (THIRD) OF TRUSTS § 13 cmt. b. Instead, express trusts may be created by an "act of the parties" where one party accepts "property *with the express or implied understanding* that he is not to hold it as his own absolute property, but to hold and apply it for certain specified purposes." *Tucker v. Brown*, 199 Wash. 320, 330-31, 92 P.2d 221 (1939) (emphasis added). In the absence of explicit trust language, evidence of a settlor's "intention to impose enforceable duties" weighs in favor of finding that a trust exists. RESTATEMENT (SECOND) OF TRUSTS § 25 (AM. L. INST. 1959).

No. 99183-9

On February 22, 1889, the United States government passed the Enabling Act to admit the states of Washington, Montana, North Dakota, and South Dakota to the Union. The federal government granted Washington several hundreds of thousands of acres of land "for the support of common schools" that were to be "held, appropriated, and disposed of exclusively for the purposes" of those schools.[4] Enabling Act §§ 10, 17. The Enabling Act actually contemplated support for a much broader group of institutions (not just schools), providing that granted lands were intended to create and maintain a variety of state institutions, including charitable, educational (universities, agricultural and scientific schools), penal, and reformatory institutions as well as other government buildings. *Id.* §§ 11, 12, 16, 17.

The Enabling Act was a mechanism "to encourage western migration" by providing new states, like Washington, with the means to generate and maintain a permanent fund to support its public institutions. *PUD No. 1*, 182 Wn.2d at 547-58 (citing MATTHIAS NORDBERG ORFIELD, FEDERAL LAND GRANTS TO THE STATES WITH SPECIAL REFERENCE TO MINNESOTA 41 (1915)); *see* Enabling Act §§ 11, 13.

---

[4] Although information in the record varies regarding the precise acreage, DNR represents that it manages approximately three million acres of state forestlands. Br. of Beneficiary Resp'ts at 6; Br. of Resp'ts at 4; Clerk's Papers at 10; *Managed Lands*, WASH. STATE DEP'T OF NAT. RES., https://www.dnr.wa.gov/managed-lands [https://perma.cc/EBP4-PA6D]. Several hundred thousand acres of these lands were granted to the State by various counties pursuant to RCW 79.22.040. Such lands are "held in trust and administered and protected by [DNR] in the same manner as other state forestlands," but they do not fall under the Enabling Act. RCW 79.22.040; *Chuckanut Conservancy v. Dep't of Nat. Res.*, 156 Wn. App. 274, 287, 232 P.3d 1154 (2010). Unlike federally granted lands, revenue generated from forest board lands must be distributed to the county that granted the land. RCW 79.64.110; *Chuckanut Conservancy*, 156 Wn. App. at 287.

No. 99183-9

To that end, the Enabling Act provided "[t]hat upon the admission of each of said States into the Union" certain lands, excluding certain permanent reservations, "are hereby granted to said States for the support of common schools." Enabling Act § 10. Sections 16 and 17 specified the quantities of land originally granted to the State, providing 90,000 acres "for the use and support of agricultural colleges," Enabling Act § 16, and

> [f]or the establishment and maintenance of a scientific school, one hundred thousand acres; for State normal schools, one hundred thousand acres; for public buildings at the State capital, in addition to the grant hereinbefore made for that purpose, one hundred thousand acres; for State charitable, educational, penal, and reformatory institutions, two hundred thousand acres.

*Id*. § 17. This section went on to provide that the State would not be entitled to any other land grants except as specified in the Enabling Act and that "the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective States may severally provide." *Id*. The Enabling Act also imposed several requirements on the State. First, it was to create and maintain a public school system. *Id*. § 4. Second, the State was required to sell or otherwise dispose of granted lands only by public sale and for full market value. *Id*. § 11. Third, in the event the State elected to rent or lease the lands for certain agricultural, mineral, oil, gas, or hydrocarbon exploration, or timber harvest purposes, it was required to distribute the proceeds of these activities to maintain and support the enumerated state

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99183-9

institutions. *Id.*[5] Further, the Enabling Act provided that the federal government would pay the State five percent of certain land sale proceeds "to be used as a permanent fund, the interest of which only shall be expended for the support of common schools." *Id*. § 13.

These provisions make clear that the federal government intended to create a trust whereby the State accepted control of the granted lands with the express understanding that the lands were not its absolute property but, instead, were to be held and used exclusively for the enumerated purposes. *See Tucker*, 199 Wash. at 330-31; RESTATEMENT (THIRD) OF TRUSTS § 13; RESTATEMENT (SECOND) OF TRUSTS § 25; *see also PUD No. 1*, 182 Wn.2d at 536 (State may hold property either in "'a proprietary capacity, as individuals generally hold property,'" or in "'a governmental capacity, that is, in trust for the public use'" (quoting *State v. Super. Ct.*, 91 Wash. 454, 458, 157 P. 1097 (1916))). Although the Enabling Act in and of itself "had no binding effect, for it was no more than a proposition or offer of a contract," its provisions became legally enforceable "after the state had accepted the terms of the enabling act by framing and passing a constitution, and Congress had approved the constitution, and the president of the United States had issued a proclamation to that effect." *Boeing Aircraft Co. v. Reconstruction Fin. Corp.*, 25

---

[5] As amended by Pub. L. No. 91-463, 84 Stat. 987 (1970); Pub. L. No. 90-41, 81 Stat. 106 (1967); 62 Stat. 170 (1948); 47 Stat 150 (1932).

14

Wn.2d 652, 658, 171 P.2d 838 (1946). The federal government specifically conditioned admission to the Union on the State's creation of a constitution and form of government that complied with "all the provisions of [the Enabling Act]," Enabling Act § 8, and the state accepted these conditions in framing its constitution.[6]

The Washington Constitution was ratified approximately seven months after the Enabling Act was passed and provided, in part, that "[a]ll the public lands granted to the state are held in trust for all the people." WASH. CONST. art. XVI, § 1. Article XVI, section 1 governs the "disposition of" school and granted lands and requires that any sale or other disposition of said lands must be for "the full market value of the estate or interest disposed of." *Id*. Subsequent sections govern the "manner and terms of sale" of public lands, investment of the permanent common school fund (which was contemplated by section 11 of the Enabling Act), and investment of higher education permanent funds. WASH. CONST. art. XVI, §§ 2-6.

---

[6] The Enabling Act provided:

> [a]nd if the constitutions and governments of said proposed States are republican in form, and if all the provisions of this act have been complied with in the formation thereof, it shall be the duty of the President of the United States to issue his proclamation announcing the result of the election in each, and thereupon the proposed States which have adopted constitutions and formed State governments as herein provided shall be deemed admitted by Congress into the Union under and by virtue of this act on an equal footing with the original States from and after the date of said proclamation.

Enabling Act § 8.

15

No. 99183-9

On November 11, 1889, President Benjamin Harrison proclaimed "the fact that the conditions imposed by Congress on the State of Washington to entitle that State to admission to the Union have been ratified and accepted and that the admission of the said State into the Union is now complete." Proclamation No. 8, 26 Stat. 1552-53 (Nov. 11, 1889).

The federal government was clear in its intent regarding the State's perpetual duty to hold and manage granted lands for specified purposes, and the State's acceptance of this duty is proved by the fact of its admission to the Union. It is important to note that although Conservation NW refers to article XVI, section 1 as a "constitutional trust mandate," our constitution did not, in and of itself, create a trust. As discussed above, trusts require a grant of property by a trust settlor; only the federal government and various counties have granted land to the State, not the State itself. Article XVI, section 1, therefore, is better understood as a reflection of an existing trust mandate. In this case, the only logical conclusion is that article XVI, section 1 recognizes the trust mandate that was created by the Enabling Act. Accordingly, we hold that the Enabling Act created a trust for the beneficiaries enumerated therein.[7]

---

[7] Our conclusion is reinforced by the fact that our legislature has recognized that "state lands" are held in trust for the enumerated state institutions originally set forth in the Enabling Act (schools, universities, agricultural colleges, scientific schools, government buildings, and charitable, educational, penal, and reformatory institutions). RCW 79.02.010(15) (governing public lands management). Further, although not determinative of DNR's trust obligations under Washington

16

No. 99183-9

    B. DNR's obligations as trustee and under article XVI, section 1

Now that we have determined that a trust was created by the Enabling Act, the sole issue in dispute is whether DNR's challenged land management strategies—the Harvest Calculation and the Marbled Murrelet Strategy—violate its obligations under article XVI, section 1. We begin by reciting the general duties DNR bears as a trustee.

The creation of a trust imposes several key duties on the trustee. The trustee must carry out the intent of the settlor as determined by the terms of the trust. RESTATEMENT (THIRD) OF TRUSTS § 76; *see Townsend v. Charles Schalkenbach Home for Boys, Inc*., 33 Wn.2d 255, 261-62, 205 P.2d 345 (1949) ("If the trustees

---

law, our conclusion also finds support in decisions from Montana, North Dakota, and South Dakota, which were admitted to the Union under the same Enabling Act as Washington. The highest court of each of these states has held that the Enabling Act created a trust and that federally granted land was to be held in trust for the beneficiaries enumerated in the act. *Bryant v. Bd. of Exam'rs*, 130 Mont. 512, 515, 305 P.2d 340 (1956) ("As to all these lands Montana takes title as does a trustee of an express trust, charged with the duty of devoting the trust property both the corpus and the income to the purpose specified in the instrument (here the Enabling Act) by which the trust is created."), *overruled on other grounds by State v. State Bd. of Exam'rs*, 131 Mont. 188, 194, 309 P.2d 336 (1957); *State ex rel. Bd. of Univ. & Sch. Lands v. City of Sherwood*, 489 N.W.2d 584, 585 (N.D. 1992) ("When North Dakota was admitted to the Union in 1889, it received several million acres of land from the public domain for the support and maintenance of schools. This land, commonly known as school trust land, is held in trust by the State and carries numerous restrictions upon transfer." (citations omitted)); *Kanaly v. State ex rel. Janklow*, 368 N.W.2d 819, 821-22 (S.D. 1985) ("Several provisions of the Enabling Act empowered the new state to designate and dedicate various acreages of federal land to different educational institutions on the condition that the proceeds of any disposition constitute a permanent fund for the support of the public schools for which the land had been granted. The South Dakota Constitution, adopted in 1889, mirrored the permanent trust fund requirement of the Enabling Act. Article VIII, § 7, of the South Dakota Constitution provides that all lands or money received for educational or charitable institutions from the United States or other sources, and the proceeds therefrom, shall remain perpetual funds, and shall be inviolably used for the specific objects of the original gifts.").

17

No. 99183-9

refuse or fail to carry out the intention of the creator of the trust, it is the duty of courts of equity to require them to act or to appoint other trustees in their stead."). The trustee owes a duty of undivided loyalty to trust beneficiaries (i.e., the essential purpose of the trust) designated by the settlor of the trust. RESTATEMENT (SECOND) OF TRUSTS §§ 169-85; *Skamania*, 102 Wn.2d at 134; *Monroe v. Winn*, 16 Wn.2d 497, 508, 133 P.2d 952 (1943). With respect to trusts in land, specifically, the trustee owes a general duty "to use reasonable care and skill to make the trust property productive" through leasing or managing it to generate income. RESTATEMENT (SECOND) OF TRUSTS § 181 & cmt. a (noting terms of trust will dictate whether trustee must use land to generate income, give beneficiaries possession of land, or simply hold land without generating income as in the case of temporary trusts). Finally, if a trust instrument gives the trustee discretion with respect to the management of the trust property, the trustee's exercise of discretion is subject to the court's control only when necessary to prevent an abuse of that discretion. RESTATEMENT (SECOND) OF TRUSTS § 187 & cmt. a; *see Monroe*, 16 Wn.2d at 508.

As Conservation NW points out, "[t]he question of how granted lands are held was left entirely to the State of Washington." Appellants' Opening Br. at 22. The Enabling Act, while providing that "the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned," left the precise manner of such holding, appropriation, and disposition (i.e., the day-to-

18

No. 99183-9

day management of the trust) to the discretion of our legislature. Enabling Act § 17 (granted lands to be controlled "in such manner as the legislatures of the respective States may severally provide"). Our legislature created DNR as an agent of the State to oversee and carry out the management of "forest and land resources in the state," including the state and forest board lands at issue. RCW 43.30.010.

Because DNR is an administrative agency of the State, we review de novo its land management strategies to discern whether DNR "has exercised its discretion in accordance with [the] law." RCW 34.05.574(1); *Wash. Indep. Tel. Ass'n v. Wash. Util. & Transp. Comm'n*, 149 Wn.2d 17, 24, 65 P.3d 319 (2003). We will reverse DNR's actions only if Conservation NW, as the party bearing the burden of proof, has shown them to be unconstitutional, in excess of DNR's statutory authority, arbitrary and capricious, or performed without legal authorization. RCW 34.05.570(1)(a), (4)(c); *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 598, 957 P.2d 1241 (1998) ("Agency action is arbitrary and capricious where it is willful and unreasoning and taken without regard to the facts and circumstances."); *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 381, 932 P.2d 139 (1997). Conservation NW does not challenge DNR's actions on the basis of its statutory powers or legal authorization, so our analysis will focus on whether DNR's actions were constitutional and whether they were arbitrary and capricious.

No. 99183-9

Conservation NW argues that the terms of the Enabling Act apply only to DNR's activities that involve selling or disposing of granted lands and resources derived from them, and not those that involve its day-to-day management, which should prioritize land use for the benefit of all Washingtonians under article XVI, section 1. Statement of Grounds for Direct Review at 14. Conservation NW urges that DNR's decision to prioritize (or maximize) generating revenue from timber harvests is actually detrimental to the broader public interest because it does not provide a stable (or significant) source of income and undermines efforts to conserve natural resources and habitat, combat climate change, and prevent wildfires and land erosion.[8] *Id*. at 3. DNR counters that generating revenue from timber sales strengthens the enumerated state institutions and counties and, in turn, has a positive effect on the general population, which stands to gain from having stable educational and governmental institutions, adding that timber harvests have the indirect benefit of providing jobs that boost local economies.[9] DNR adds that its land management strategies do not aim to maximize revenue "at the expense of forest health." Br. of

---

[8] Several amici have filed briefs in support of this position. *See* Amicus Br. of Climate Action Families at 4, 14-15; Amicus Curiae Br. of Judith Billings and Barbara Schaad-Lamphere at 6, 19, 23-27; Br. of Amici Curiae Earth Law Ctr. et al. at 19-21; Amicus Br. of Ernest Niemi at 20, 29; Br. of Amici Curiae Mason County Climate Justice at 14-15.

[9] Several amici have filed briefs supporting this position. *See* Br. of Amici Curiae Wash. State School Dirs.' Ass'n at 7; Br. of Amicus Curiae Ass'n of Wash. Bus. at 6-8; Wash. Forest Prot. Ass'n, Amicus Curiae Br. at 4, 6; Br. of Amicus Curiae Skagit County at 10; Br. of Amicus Curiae Wash. Council of Machinists at 14-16; Br. of Amicus Curiae Wash. State Ass'n of Counties at 10-11.

No. 99183-9

Resp'ts at 32. Instead, DNR contends that it manages state and forest board lands in compliance both with its trustee obligation to obtain the fair market value of any transferred interest in the land *and* with its obligation to harvest resources, such as timber, from these lands in a manner that limits negative effects on our ecosystem in compliance with other laws, such as the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and the sustained harvest act, RCW 79.10.300-.340.

It is important to note that we must be mindful of the principle that our state constitution and the Enabling Act "should be construed in harmony." *Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 312, 996 P.2d 582 (2000); *see Wash. Water Jet Workers Ass'n*, 151 Wn.2d at 484 ("Where history suggests that there was more than one purpose behind a constitutional provision, logic dictates that the provision should be interpreted such that it satisfies each purpose."). Article XVI, section 1 was drafted and later approved as being in conformity with the provisions of the Enabling Act. *See* Enabling Act § 8; Proclamation No. 8. We also presume that DNR's trust obligation with respect to forest board lands under chapter 79 RCW was not drafted in a way that conflicts with article XVI, section 1. *See State ex rel. Peninsula Neigh. Ass'n v. Dep't of Transp.*, 142 Wn.2d 328, 342, 12 P.3d 134 (2000) ("The construction of two statutes shall be made with the assumption that the Legislature does not intend to create an inconsistency. Statutes are to be read together, whenever possible, to achieve a 'harmonious total statutory scheme . . .

21

No. 99183-9

which maintains the integrity of the respective statutes.'" (alteration in original) (citation and internal quotation marks omitted) (quoting *Employco Pers. Servs., Inc. v. City of Seattle*, 117 Wn.2d 606, 614, 817 P.2d 1373 (1991))). Logically, DNR's land management strategies must align with its obligations under the Enabling Act, RCW 79.22.040, and article XVI, section 1. *See* RCW 34.05.570(4)(c).

Conservation NW advances a commendable argument that the management of state and forest board lands should also combat climate change and conserve and protect our crucial ecosystem. However, DNR's decision to generate revenue from timber harvests does not undercut its obligations under the Enabling Act or article XVI, section 1. As discussed above, both laws were drafted with the overarching purpose of supporting state institutions. Enabling Act § 11; WASH. CONST. art. XVI, § 1. Both laws contemplated that the state lands would be sold, leased, and/or exploited for the natural resources available within or on them. Enabling Act § 11; WASH. CONST. art. XVI, §§ 1-4. Both laws also clearly directed that revenue derived from state lands was to be applied for the exclusive purpose of supporting enumerated state institutions. Enabling Act §§ 11, 13; WASH. CONST. art. XVI, §§ 5-6. Conservation NW presents DNR's position to be that under *Skamania*, DNR is required to prioritize revenue maximization from federally granted lands regardless

22

No. 99183-9

of the environmental toll. DNR does not advance such an argument, nor would *Skamania* support it.[10]

As this court has recognized, the Enabling Act did not restrict the State to a specific actual use of the granted lands, contemplating instead that the State would either sell the lands or use them for income-generating activities. *PUD No. 1*, 182 Wn.2d at 547-48; *see* Enabling Act § 11. There appear to be myriad ways DNR *could* choose to generate revenue from the state and forest board lands or otherwise put them to use for the benefit of the enumerated beneficiaries.[11] *See* RCW 79.10.120 (providing that DNR "may" adopt "multiple uses" of granted lands consistent with its trust obligations, such as recreational areas, scientific studies, special events, scenic areas, etc.). While there is nothing in the Enabling Act that requires DNR to generate revenue specifically from timber harvests on state lands,[12] DNR *may* elect

---

[10] Contrary to Conservation NW's briefing, DNR cites *Skamania* (along with much earlier precedent) to support its position that it owes an undivided duty of loyalty to the beneficiaries enumerated in the Enabling Act, *not* that it must prioritize revenue maximization. Br. of Resp'ts at 18-23, 30; *see Skamania*, 102 Wn.2d at 139 (unilateral termination of timber contracts violated DNR's fiduciary duty to obtain full market value for trust assets according to explicit terms of Enabling Act).

[11] *See, e.g.*, Daniel Jack Chasan, *A Trust for All the People: Rethinking the Management of Washington's State Forests*, 24 SEATTLE U. L. REV. 1, 42 (2000) (arguing that public trust doctrine applies to all public lands and requires government to balance "the environmental and aesthetic values of the granted lands . . . against the state's duty to earn money for the schools; those values must be safeguarded for all the people and preserved for future generations").

[12] Conversely, DNR is obligated by statute to harvest timber from forest board lands, while also ensuring such lands are "protected, and cared for . . . to ensure natural reforestation." RCW 79.22.070(1); *see* RCW 79.22.040 (forest board lands to be "administered and protected . . . in the same manner as other state forestlands"). DNR could also, however, provide for "multiple uses" of forest board land as long as such uses are consistent with its trust obligations to the county beneficiaries. RCW 79.10.120.

No. 99183-9

to do so because of the discretion the Enabling Act granted to the State in the day-to-day management of federally granted lands. Enabling Act § 17. Timber harvests enable DNR to make state lands productive, which aligns generally with its duties as trustee of a land trust. RESTATEMENT (SECOND) OF TRUSTS § 181 & cmt. a. Further, as DNR points out, generating revenue for the enumerated beneficiaries is advantageous to "all the people" of Washington because they stand to benefit from having stable and financially viable public systems of education and governance. Conservation NW has not established that DNR's land management strategy is unconstitutional or otherwise in violation of its obligations under the Enabling Act, RCW 79.22.040, or article XVI, section 1. *See* RCW 34.05.570(1)(a), (4)(c).

Even accepting, arguendo, that we were of the opinion that timber harvests should not be prioritized over other activities (such as those suggested by Conservation NW), we still would not be empowered to reverse DNR's Harvest Calculation or Marbled Murrelet Strategy as arbitrary and capricious for the reasons already discussed—DNR's position is a defensible exercise of its discretion to make state and forest board lands productive properties. *Theodoratus*, 135 Wn.2d at 598 ("If there is room for two opinions, a court will not find arbitrary and capricious action even if the reviewing court believes the agency's decision wrong.").[13] Our

---

[13] We do not address the other two grounds for reversal because Conservation NW does not challenge DNR's statutory authority or allege that the approval of the Harvest Calculation or the Marbled Murrelet Strategy was performed without legal authorization. *See* RCW 34.05.570(4)(c).

No. 99183-9

inquiry into the propriety of DNR's exercise of its discretion ends here. RCW 34.05.570(4)(c). We affirm the trial court's dismissal of the case.

## IV.    CONCLUSION

The Enabling Act created a trust that requires the State, through its agency, DNR, to manage state lands for the benefit of enumerated state institutions. DNR is likewise obligated by statute to manage forest board lands for the benefit of the counties who granted land to the State. DNR is not required to harvest timber from state lands (although it is required to do so with respect to forest board lands), but it may elect to do so to generate revenue for its beneficiaries. The land management strategies at issue, which relate to DNR's timber harvest activities, do not conflict with the constitutional mandate that all granted public lands shall be held in trust for "all the people" in Washington. Using granted state and forest board lands as productive trust property aligns with DNR's general trustee duties and provides a benefit to the general population by boosting local economies as well as maintaining stronger and better-funded public systems of education and governance. We recognize the important compelling interests in conservation and environmental health raised by Conservation NW and various amici, but these policy issues must be left to the legislature. DNR's discretionary land management strategies are neither unconstitutional nor arbitrary and capricious. Accordingly, we affirm the trial court's dismissal of the case on the alternate grounds set forth above.

25

_____
Whitener, J.

WE CONCUR.

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Yu, J.

_____
Owens, J.